1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,         : 20-cr-228 (LDH)
                                  :
                                  :
                                  :
        -against-                 : United States Courthouse
                                  : Brooklyn, New York
                                  :
                                  :
                                  : February 12, 2025
EMERSON MARTINEZ-LARA,            : 11:00 a.m.
                                  :
        Defendant.                :
                                  :
- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE LaSHANN DeARCY HALL
UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:   JOHN J. DURHAM
                      United States Attorney
                      Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                      BY:   JONATHAN SIEGEL
                            ANNA KARAMIGIOS
                            Assistant United States Attorneys

For the Defendant:    DIAZ & MOSKOWITZ, PLLC.
                         225 Broadway, Suite 715
                         New York, New York 10007
                      BY:   JOHN DIAZ, ESQ.

                      GREEN & WILLSTATTER
                         200 Mamaroneck Avenue
                         White Plains, New York 10601
                      BY:   RICHARD D. WILLSTATTER, ESQ.

                      SAHLI LAW, PLLC
                         195 Broadway, 4th Floor
                         Brooklyn, New York 11211
                      BY:   EMILEE ANN SAHLI, ESQ.

Court Reporter:  MICHELE D. LUCCHESE, RPR
225 Cadman Plaza East / Brooklyn, NY 11201
MLuccheseEDNY@gmail.com
Proceedings recorded by mechanical stenography; transcript produced by Computer-Aided Transcription.

                          Proceedings                          2

1              THE COURTROOM DEPUTY:  All rise.

2              Good morning.   This is a criminal cause for a

3    sentencing in the matter of USA versus Emerson Martinez-Lara,

4    docket No. 20-cr-228.

5              The Spanish interpreter has been previously sworn.

6              Counsel, state your name for the record, starting

7    with the Government.

8              MR. SIEGEL:  Good morning, Your Honor.

9              Jonathan Siegel, Anna Karamigios, and Paralegal

10   Specialist Eleanor Jaffe-Pachuilo for the United States.

11             THE PROBATION OFFICER:  And Alexandria Lohwasser for

12   Probation.

13             MR. DIAZ:  Good morning, Your Honor.

14             John Diaz appearing for the defendant, Emerson

15   Martinez-Lara.  And also with me is Richard Willstatter,

16   Emilee Sahli, and Kimberly Tavares.

17             THE COURT:  Good to see you all.  You all may be

18   seated.

19             Folks, so we are here today for a sentencing

20   determination on the indictment against the defendant, Mr.

21   Martinez-Lara.

22             Present today are counsel for both the Government,

23   as well as the defendant.  The defendant is present, a

24   representative from the Probation Department, all of whom

25   their presence has been noted for the record.

Proceedings                                          3

1          Now, on April 23rd of 2024, Mr. Martinez-Lara

2     pleaded guilty to Count 21 of the indictment, which was filed

3     on June 15, 2023.

4          Now, Count 21 charges -- give me a second.  There

5     was a superseding indictment.  Is there a number -- is it just

6     the superseding?

7          MR. SIEGEL:  That was the second superseding.

8          THE COURT:  Second superseding, okay.

9          Now, Count 21 charges that on February 3, 2019, the

10    defendant, together with others, in the course of a violation

11    of 18 U.S.C. Section 924(c), specifically, the crime charged

12    in Count 20, did knowingly and intentionally cause the death

13    of a person through the use of a firearm, which killing was

14    murder, in that the defendants, together with others, with

15    malice aforethought, did unlawfully kill Abel Mosso willfully,

16    deliberately, maliciously and with premeditation in violation

17    of 18 U.S.C. Section 924(j)(1).

18         Now, this Court found that Mr. Martinez-Lara had

19    made his plea knowingly and voluntarily and that there was a

20    factual basis for Mr. Martinez-Lara's plea.  Accordingly, this

21    Court accepted Mr. Martinez-Lara's plea of guilty on June 10th

22    of 2024.

23         Now, in advance of this proceeding, I received and I

24    reviewed a June 15, 2023 superseding indictment filed as ECF

25    docket No. 243, an October 17, 2024 presentence investigation

Proceedings                                        4

1   report, and presentencing recommendation filed as ECF docket

2   No. 603, a February 6, 2025 addendum to the PSR, which was

3   filed as ECF docket No. 762, a December 13, 2024 sentencing

4   memorandum by the Government filed as ECF docket No. 707, a

5   July 13, 2025 supplemental to the Government's submission

6   filed as ECF docket No. 728.

7          I have the defendant's January 13, 2025 sentencing

8   memorandum filed as ECF docket No. 729, a January 27, 2025

9   supplement to the defendant's sentencing memorandum filed as

10  ECF docket No. 749.  In addition, I have a supplemental letter

11  of support filed by the defendant, dated January 23, 2025 and

12  filed as ECF docket No. 743.

13         Is there anything else that I should have in front

14  of me, folks?

15         MR. DIAZ:  Not from the defendant.

16         MR. SIEGEL:  Not from the Government.

17         THE COURT:  All right.  Mr. Siegel, do you have any

18  witnesses present in the courtroom today?

19         MR. SIEGEL:  No, Your Honor.

20         THE COURT:  All right.

21         Do you believe that I will need to hold any sort of

22  evidentiary hearing to resolve any disputed issue of fact?

23         MR. SIEGEL:  No, Your Honor.

24         THE COURT:  Will there be any individuals making a

25  statement today, victim impact statement of any sort?

Proceedings                                                              5

1        MR. SIEGEL:  Your Honor, we have been in touch with

2   the mother of Abel Mosso.  She was notified of today's

3   proceeding and chose not to come.  I have a letter from her

4   that I was planning to read.  I have provided a copy to

5   defense counsel.  I provided it at some point to Probation,

6   but it didn't end up in the PSR addendum.

7        I could hand it up when I am done reading it if you

8   would like it handed up.

9        THE COURT:  Yes, I would, when you are done reading

10  it, like to have it handed up.

11       All right, Mr. Diaz, have you and Mr. Martinez-Lara

12  discussed and read the presentence report?

13       MR. DIAZ:  Yes, Your Honor.

14       THE COURT:  And you have discussed whether you have

15  any objections thereto?

16       MR. DIAZ:  Yes, Judge.

17       THE COURT:  Now, with respect to objections thereto,

18  I know, at least in your submission, that you had made an

19  argument that he was not a, quote, full member of the gang

20  MS-13.  I'm not certain what legal -- and I think this is a

21  point that the Government made -- consequence there is whether

22  or not you include the word "full" or not.  He was an

23  associate of the gang and the Court will treat him

24  accordingly.

25       And, then, of course, there is an argument that you

Proceedings                                                        6

1   made in your submission, I believe it is at page 11,

2   concerning whether the Court should consider Mr. Martinez-Lara

3   either a minor or a minimal participant, and I will get to

4   that just before I do my own calculation of the guidelines

5   range.  But I think other than that that's --

6              MR. DIAZ:  That's correct, Judge.

7              THE COURT:  Okay.  And I don't believe that you are

8   asking, though, either in connection with that objection or

9   otherwise, for an evidentiary hearing to resolve a disputed

10  issue of fact.  Am I correct?

11             MR. DIAZ:  That's correct, Your Honor.

12             THE COURT:  All right.  And beyond Mr.

13  Martinez-Lara, who I am assuming will be addressing the Court

14  today, do you have anyone who you wish to address the Court

15  today?

16             MR. DIAZ:  No, Your Honor, but I would like to just

17  note the presence of my client's uncle and his aunt who are

18  present in court.

19             THE COURT:  Good morning, sir and ma'am.

20             All right, folks, I want to talk now about the

21  maximum sentence available.

22             Now, with respect to Count 21, the maximum term of

23  imprisonment is life.

24             Now, the Court may impose a term of supervised

25  release of not more than five years.  The defendant is

Proceedings                                                    7

1  ineligible for probation because it is expressly precluded by

2  statute.

3           And the maximum fine for Count 21 is $250,000.  And

4  the Court must order a special assessment in the amount of

5  $100.

6           Is restitution being sought here?

7           MR. SIEGEL:  No, Your Honor.

8           THE COURT:  Okay.  Now, folks, the PSR calculates an

9  effective guidelines range of 235 months to 293 months

10 imprisonment.  And that is based on a total offense level of

11 38 and a Criminal History Category of I.

12          As the parties are aware, that calculation is

13 arrived at in part by the inclusion of a minor participant

14 role in the offense.  In his submission, the defendant argues

15 that the Court should instead apply a minimal participant role

16 in the offense, which would allow for an additional two-level

17 deduction.

18          I will hear from you, Mr. Diaz, on this point.

19          MR. DIAZ:  Thank you, Your Honor.

20          And as we laid out in our submission, Judge, we

21 don't think this is something that involves a large universe

22 of facts.  I think the facts here are very simple, Judge, and

23 our argument is very simple.

24          Firstly, Mr. Martinez-Lara did not participate in

25 the planning or organization of this murder.  Mr.

Proceedings                                          8

1   Martinez-Lara was instructed where to be to act as a lookout.

2           We also ask the Court to consider that Mr.

3   Martinez-Lara had no decisionmaking authority with respect to

4   the planning of this murder.  And also, Judge, he had no

5   pecuniary gain in this crime, Judge.

6           THE COURT:  The truth is, though, with MS-13, at

7   least as I have been educated, often pecuniary gain is a

8   non-issue.  So, it seems to me, given the nature of this

9   crime, given the organization for which he was involved in,

10  that factor becomes a non-factor for me.

11          This is what I would like to do, because I wanted to

12  look closely at the facts of this case, and I agree with you,

13  the universe of facts that are at issue on this point are

14  narrow.  But in looking to the Sentencing Guidelines, and in

15  particular, the application notes, which should drive the

16  Court's consideration here, there is a fact-based

17  determination that is set out at Application Note 3C.  But

18  that fact-based determination includes factors that the Court

19  is to look at, am I correct, in assessing both whether someone

20  is either a minor participant or a minimal participant?

21          So, it is not exclusive only to a minimal

22  participant designation.  And, so, the satisfaction of those

23  factors in C, as it seems to me, does not end the Court's

24  inquiry, because the satisfaction of the factors that are set

25  forth in Application Note 3C could simply go to satisfying the

Proceedings                                                9

1    minor participant.

2              Is it not the case that in order for the Court to

3    arrive at the conclusion that the minimal participant role is

4    applicable here that I also need to find that under the

5    provision that the defendant lacked the knowledge or

6    understanding of the scope and the structure of the enterprise

7    and the activities of others, which would be indicative of his

8    minimal participation, isn't that required?

9              And I don't think that the recitation of the factors

10   that apply here gets me to that point.  So that's what I think

11   you need to focus on.

12             MR. DIAZ:  Yes, Judge.  And the Court does have wide

13   discretion here, Judge, and I think even under application of

14   3C, it notes that we're evaluating the conduct within the act

15   itself, not, you know, other cases or what other members were

16   doing.

17             THE COURT:  But he understood that he was serving as

18   a lookout not for, say, a robbery.  Not that I am suggesting a

19   robbery is okay.  Not for, say, a car theft.

20             He understood that he was serving as a lookout for

21   the purposes of killing a rival on a New York City subway

22   platform.

23             MR. DIAZ:  Yes, Your Honor.  I would add to that and

24   ask the Court to add in its analysis is what we also discussed

25   regarding his role there, Judge, that he was -- and, again,

Proceedings                                                    10

1   Judge -- just to back up a little bit, Your Honor.  And I know

2   that the Court knows a lot about MS-13, low-level individuals,

3   Judge, get routinely instructed to do things.  He was

4   instructed, you know, to be at a certain location.  And

5   additionally to that, Judge, as we laid out in our memo, he

6   had been under threat.  He had been intimidated by the gang.

7   So, I think in the totality of circumstances, Judge, which is

8   what we're supposed to be looking at here, what the Court said

9   is absolutely correct, Your Honor.  When looking at it through

10  that perspective, kind of like a straw, yes, that is the

11  universe.  But what I'm asking the Court is to go a little bit

12  outside of that, Judge.

13          THE COURT:  Isn't that more appropriate for the

14  purposes of the Court's consideration of a variance as opposed

15  to the application of a minimal participant role?

16          Because the way in which I approach sentencing is

17  that when it comes to the calculation of the guidelines range,

18  perhaps I'm conservative compared to other judges, but I

19  believe that I need to -- when it comes to the calculation of

20  the guidelines, I really need to hew closely to the language

21  of what is kind of our statute here, which is the guidelines.

22          A variance, if you want me to consider those

23  factors, it seems that is where I would consider it given the

24  fact that there was at least no misunderstanding, as I can

25  see, as to the nature of this particular crime.  And, indeed,

Proceedings                                                    11

1   as the PSR indicates, on two other occasions, however the

2   circumstances are that he may have ended up there, but on two

3   other occasions, he also engaged in looking for rivals with a

4   gang member.  So this notion that we can satisfy the question

5   of lack of knowledge or understanding about the activities is

6   hard for me to get to.

7          MR. DIAZ:  And I understand the Court's concern,

8   Your Honor.  And my response is that without analyzing that

9   additional piece, I don't think we have a complete picture,

10  Your Honor, because, yes, those two other instances that the

11  Court referenced.  But, again, this is part of that pattern,

12  Judge, where he was being instructed to do things.  He was

13  being threatened.  And I think that that's important when

14  analyzing his level of knowledge in the overall planning that

15  was going on, is he's merely showing up if he's following the

16  orders.

17         THE COURT:  He knew that they were going to kill a

18  rival.

19         MR. DIAZ:  That is true, Judge, but, again, the

20  details of how that was going to happen and --

21         THE COURT:  Exactly, and hence he was afforded the

22  minor participant role.

23         MR. DIAZ:  He was, Judge.  And what I'm saying is

24  that it goes a step further.  Let me give you an example.

25  There is a case that is coming up before Your Honor on

Proceedings                                          12

1    February 28th.  I read all these cases, trying to read and

2    parcel out everyone's involvement.  And I have the case here.

3    I will tell you what it is, Judge, in a minute.  But in that

4    case, in the Government's support of a 22-year sentence, it

5    described how this young person, over the course of several

6    months, groomed the victim, lured him to a certain location.

7    After the murder, went on the victim's phone, deleted text

8    messages.  Again, we're not comparing our case with other

9    cases.  We're comparing minimal role within the context of our

10   facts.

11           But in the context of how this gang operates, Your

12   Honor, the level of planning that goes into them actually

13   orchestrating these murders, the use of social media, the use

14   of texts, all these things, and when compared by the actus

15   reus that was performed by Mr. Martinez-Lara, which is

16   significantly less, Judge, right, he has no decisionmaking as

17   to where this is going to happen, who the victim is going to

18   be, not even where he's going to be located.  And I think that

19   in the application note it says this is intended to cover

20   defendants who are plainly the least culpable of those

21   involved in the conduct of a group.

22           THE COURT:  Yes.

23           MR. DIAZ:  I'm reading minimal participant

24   Application Note 4.

25           And I think that when analyzed altogether, Judge,

Proceedings                                                              13

1   with what we also talked about the context of what was going

2   on in his life, the threats, and I think it is an

3   uncontroverted fact that the Government will not contest, that

4   Mr. Martinez-Lara did make efforts to leave the gang and did

5   leave the gang for a certain period of time, Judge.

6                THE COURT:  How do I reconcile your argument?  And I

7   hear what you're saying.

8                I'm trying to reconcile -- there are three sentences

9   that have minimal participant.  You are highlighting the

10  second.  I have highlighted the third.

11               Reconcile those two for me in a satisfactory way,

12  because I've got to, right.  Because it can't simply be that

13  in every single case, if you have group activity, that I

14  simply identify the person who is the least culpable of that

15  activity and they are then, therefore, entitled to a minimal

16  participant role.

17               That third sentence, right, as far as I read it,

18  that third sentence provides the color of what that means, and

19  that seems to me what's missing here because, otherwise, we

20  would probably be giving out a minor participant role in every

21  single case where you have group activity because everyone is

22  not going to assume the exact same role in a case.  And I

23  don't believe that this particular provision is intended to

24  apply in every single case where there is group activity.  So

25  simply being the least culpable in and of itself isn't enough.

Proceedings                                              14

1    There is this knowledge prong.  There is this understanding of

2    what it is that the activity is intended to do.  And while he

3    may not have known the name of the victim, he assuredly

4    understood two things:  They were setting out to kill him and

5    they were setting out to do so on a New York City subway

6    platform.  That's the activity that he had complete knowledge

7    of.

8              You make arguments that the Court is interested in

9    hearing, but I don't know if this particular provision is the

10   vehicle through which those arguments will have great success.

11             MR. DIAZ:  Understood, Your Honor.

12             THE COURT:  Okay.  All right.  So, let's move

13   forward.

14             I'm going to calculate the guidelines range now.

15             The applicable guidelines for Count 21 is Sentencing

16   Guidelines Section 2A1.1, which provides for a base offense

17   level of 43, as the offense constitutes first-degree murder.

18             Because the investigation revealed that Mr.

19   Martinez-Lara acted solely as a lookout for the offense, a

20   minor role reduction is warranted, and that is pursuant to

21   Sentencing Guidelines Section 3B1.2 B.

22             Accordingly, the offense level is decreased by two

23   levels, which brings the adjusted offense level to 41.

24             Mr. Martinez-Lara has clearly demonstrated

25   acceptance of responsibility for the offense.  Accordingly,

Proceedings                                      15

1    the offense level is decreased by two levels, which brings the

2    adjusted offense level to 39.

3              Now, I also understand the Government intends to

4    make a motion that it was notified in a timely manner of Mr.

5    Martinez-Lara's intention to plead guilty.  Is that correct?

6              MR. SIEGEL:  Yes, Your Honor.  We so move.

7              THE COURT:  So the Government's motion is granted.

8              Accordingly, pursuant to sentencing guideline

9    3E1.1(b), the offense level is decreased by one point, which

10   brings the total offense level to 38.

11             Of course I must take into account Mr.

12   Martinez-Lara's criminal history.  As the Court, however,

13   calculates his criminal history as zero, according to the

14   Sentencing Table, Chapter 5, Part A, a criminal history score

15   of zero establishes a Criminal History Category of I.

16             Now, based upon a total offense level of 38 and a

17   Criminal History Category of I, the guidelines range for

18   imprisonment is 235 to 293 months.

19             Because Count 21 is a Class A felony, the guideline

20   range for a term of supervised release is two to five years.

21   And that's pursuant to sentencing guideline Section

22   5D1.2(a)(1).

23             The defendant is ineligible for probation because it

24   is expressly precluded by statute.

25             The fine range for this offense is from 50,000 to

Proceedings                                                    16

1    $250,000.

2              Any objections to the Court's calculation for the

3    record?

4              MR. SIEGEL:  Not from the Government.  Thank you.

5              MR. DIAZ:  No, Your Honor.

6              THE COURT:  Okay.  Now, I have already addressed the

7    question of the minor participant, but I do believe that

8    defense counsel is also seeking a downward departure based on

9    the defendant's age.

10             I will hear from you, Mr. Diaz.

11             MR. DIAZ:  Thank you, Your Honor.

12             Your Honor, as we state in our submission, Judge,

13   and the Court knows, Mr. Martinez-Lara entered into this

14   country at the age of 15, approximately 15 years old.

15   Regrettably, Emerson began associating with members of MS-13

16   shortly after coming to this country.

17             Now, with respect to the age, Your Honor, his

18   participation and association with these members I guess began

19   around that time, 15, 16 years old, when he began going to

20   school.  He began going to soccer fields to play soccer and,

21   you know, in his culture, Judge, soccer really does play an

22   important part socially.  And this is kind of where he went.

23   He entered as an unaccompanied minor.  And this is where he

24   went and started meeting people.

25             His father had sent him to the United States to

Proceedings                                                    17

1    escape gang violence.

2           And, again, Judge, at this point in his life, he is

3    newly arrived in this country.  He doesn't have much of a

4    support structure.  He had experienced trauma in his life:

5    Extreme poverty, natural disasters, and gang violence.

6           Now, when you compile all of these factors, Judge,

7    with his lack of maturity, his underdeveloped sense of

8    responsibility, I submit that Emerson was very vulnerable to

9    these outside pressures.  And these particular factors have

10   been recognized by the Supreme Court in *Roper versus United*

11   *States*, where the Court held that not only is the

12   chronological age a relevant factor entitled to great weight,

13   but so is the background and mental and emotional development

14   of a youthful defendant.

15          Additionally, Your Honor, I think that the

16   overwhelming scientific research in this area strongly

17   suggests that youths from the late teens up until the mid-20s

18   do not possess fully mature brains and are more impulsive.

19   And as the parent of two teenagers, Judge, I can attest to the

20   truth of that statement.  But applying it here, Judge, I think

21   that these factors speak to our situation, where we have a

22   young person who has these difficulties and adversus

23   conditions that he is already dealing with.  And now you have

24   this pressure, peers, people from your own culture, from your

25   own country, who look like you, who you are looking to for

1    guidance.  And these people prey on that, Judge.  I don't

2    think that -- it goes without saying that MS-13 and gangs like

3    them prey on these young people.  They seek out people who are

4    vulnerable because they're easy to control, Your Honor.  And I

5    think that is the gist of the Commission's amendment under

6    5H1.1, where the Court is aware that the Sentencing Commission

7    has recently amended the policy statement that includes a

8    downward departure may be warranted due to a defendant's

9    youthfulness at the time of the offense or prior offenses.

10   Certain factors may affect a youthful individual's development

11   into the mid-20s and contribute to involvement in the criminal

12   justice system, including environment, adverse childhood

13   experiences, substance use, lack of educational opportunities,

14   and family relationships.

15        Now, in addition, Your Honor, these youthful

16   individuals are generally more impulsive.  They are

17   risk-seeking and susceptible to outside influence.

18        And, more importantly, it is noted here that

19   youthful individuals are also more amenable to rehabilitation.

20   And I think that means a lot, Judge.  And I think that

21   distinction weighs a lot, that there is a recognition that

22   when you're young person, you're going to change over time and

23   that that young person you were at 15 is not going to be the

24   same person that you are going to be at 35.  And I think that

25   the Commission including this under 5H really reflects that,

Proceedings                                    19

1    Judge, and reflects the empirical research that has been done

2    over time.

3              And I think that this really speaks to Emerson's

4    case, Judge, and I think a downward variance under 5H1 is

5    warranted here.

6              THE COURT:  Okay.  Thank you.

7              Does the Government wish to respond?

8              MR. SIEGEL:  Thank you, Your Honor.

9              I don't think there is any dispute that Mr.

10   Martinez-Lara was young.  I don't think there is any dispute

11   that that's something that the Court can and, frankly, should

12   consider.  It is, frankly, not really clear to me if it is

13   best considered as a variance or best considered as a

14   departure.  I know there is now a departure provision for it.

15   I think it is important, wherever it goes, that it not be

16   double counted.

17             THE COURT:  Well, it wouldn't be double counted.  We

18   are talking about it now in the context of a departure.

19             MR. SIEGEL:  I guess what I would say is to the

20   extent Your Honor finds a departure is warranted for youth,

21   that's fine.  I think what's important is just the level of

22   it.

23             Just to state the obvious, this was not a purse

24   snatching or drug dealing or an impulsive fight.  This was a

25   premeditated murder.  19-year-olds, as well as 18 -year-olds

Proceedings                                                    20

1    and 10-year-olds know that murder is wrong.  And I think a lot

2    of the arguments about youth go to impulsiveness.  And this

3    was not impulsive.  This was a planned, premeditated,

4    cold-blooded murder.

5              Does youth factor into that?  I'm sure that it still

6    does.  But I wouldn't treat the level of departure or variance

7    for youth in a planned,,premeditated murder the same way that

8    you might for other kinds of crimes that really are the kinds

9    of crimes that you think of as youth violence or the kinds of

10   things that people do and then just grow up and don't do

11   anymore.

12             And I also think, you know, obviously, 19 is young.

13   I know, unfortunately, that both in this case and in other

14   cases that the Court has there are cases involving 16 year

15   olds or 17 year olds or 18 year olds.  It all exists on a

16   spectrum, which is to say that whatever departure and whatever

17   consideration is given for youth I think it has to be part of

18   the consideration because it is part of the reality here, but

19   I just don't think it's entitled to that much here given the

20   seriousness of the crime, given the circumstance of the crime,

21   given that this was -- even in the bigger picture that this

22   was part of a larger involvement in a gang that he was part of

23   for over a year, that, in light of all of that, whatever

24   weight is given, whether it is a departure or a variance, I

25   just don't think it should weigh heavily.

Proceedings                                              21

1          THE COURT:  Thank you.

2          Folks, I don't believe that there are any other

3    arguments advanced in the written submissions for a departure,

4    so I'm now going to move towards a variance, or a discussion

5    of a variance.

6          Having calculated the guidelines and considered the

7    propriety of the departure, I must now consider the relevant

8    factors set out by Congress in 18 U.S.C. Section 3553(a) to

9    ensure that I impose a sentence that is sufficient, but not

10   greater than necessary, to comply with the purposes of

11   sentencing.

12         Now, these purposes include the need for the

13   sentence to reflect the seriousness of the crime, promote

14   respect for the law, and provide just punishment for the

15   offense.  The sentence should also deter criminal conduct,

16   protect the public from future crime of the defendant, and

17   promote rehabilitation.

18         In addition to the guidelines and policy statements,

19   I must consider the nature and circumstances of the offense,

20   the history and characteristics of the defendant, the need to

21   avoid unwarranted sentencing disparities among

22   similarly-situated defendants, the types of sentences

23   available, and the need to provide restitution to any victims

24   of the offense.

25         Does the Government wish to make any arguments

Proceedings                                    22

1   concerning the application of the 3553(a) factors, request a

2   variance or otherwise make a sentencing recommendation?

3            I will hear from you now.

4            MR. SIEGEL:  Thank you, Your Honor.

5            We believe that when you weigh all of the factors,

6   we submit that a variance is not appropriate and that a

7   sentence of 240 months is the right sentence.

8            Just to start with on the seriousness of the

9   offense, every murder is awful.  Every life is a universe to

10  the family that has lost them and to that person.  With that

11  said, this murder is certainly one of the most brazen and --

12  one of the more brazen and outrageous that I have certainly

13  seen.

14           We provided the video of the murder itself, which we

15  can also play as part of the hearing if that would be helpful

16  to the Court.

17           But in this case and in this job, often I see things

18  and I think well, that's one of the craziest things that I

19  have ever seen.  And, certainly, this one is top three of just

20  unbelievable of what you're seeing, of a crowd of screaming

21  people and a group of people subduing a man and taking -- and

22  fighting over a gun, and then executing him, shooting him in

23  the head.  That's the plan that they made that this defendant

24  was part of.  He wasn't on the platform.  It wasn't his turn

25  that day.  But he was part of that plan and that was the plan.

Proceedings                                    23

1          Even after that murder happened and all of the

2    people who were on the platform were arrested within weeks, he

3    stayed a part of the gang for another year.  And there is a

4    lot in the defendant's submission about him leaving the gang

5    and intimidation from the gang.  And I just want to be clear

6    about the timeline there because I think there is some

7    looseness about the timeline.

8          He joins in 2018, late 2018.  By February of 2019,

9    he is a participant in this murder.

10         THE COURT:  I'm sorry.  One more time.  Give it to

11   me again.

12         MR. SIEGEL:  He joins in late 2018.  By February of

13   2019, he is participating in this murder.

14         Throughout 2019, after all of the participants who

15   were on the platform and were caught in the video, they were

16   all arrested, he continues on in the gang.  There are two

17   additional murder conspiracies.

18         THE COURT:  John Doe 1 and 2, or am I --

19         MR. SIEGEL:  Just because -- and this is actually

20   because we have re-numbered the John Does, it has created some

21   confusion.  But it is two John Does.

22         THE COURT:  Okay.

23         MR. SIEGEL:  It is two John Does, both of whom are

24   actually MS-13 members who are believed to have violated the

25   rules of the gang.  He participates in those in 2019.  He

Proceedings                                              24

1  continues participating in the gangs's drug sales.  He is

2  involved in the gun possession of the gang.

3          They cite -- on page 7 of the defense memo, they

4  cite phone calls where members of the gang are complaining

5  that he is being less communicative.  Those are from January

6  2020.  As late as April of 2020, they are still jail calls

7  with him and members of the gang, people from this murder,

8  where, in the April 30th call, 2020, Victor Lopez, one of the

9  people who was on the platform that day, calls the defendant,

10  and one of the things they talk about is the defendant offers

11  to provide Lopez with a new phone number for Marlon

12  Saracay-Lopez, who was the leader of this clique of the gang.

13  So, even by that point, he is still in touch with them, in

14  touch with the leadership and making those connections.

15          He's arrested in May of 2020.  So it's not that long

16  after that.

17          We don't dispute that over time he did pull away

18  from the gang.

19          THE COURT:  But when are you asserting that that

20  took place, after his arrest in May of 2020, before?

21          MR. SIEGEL:  The problem is I don't think there is a

22  clean break for him before the arrest.

23          THE COURT:  Okay.

24          MR. SIEGEL:  And I think it's important to

25  understand the context.  You know, he's associating in part of

Proceedings                                          25

1    the Indios clique.  This murder was devastating for the Indios

2    clique.  Three of their most active members were arrested

3    because they were caught on video participating in this

4    murder.

5              Over the course of 2019, the Indios clique is

6    falling apart.  One member leaves and is green lit.  One

7    member commits a shooting and is arrested, another member is

8    arrested.

9              THE COURT:  How large is a clique or this clique,

10   approximately?

11             MR. SIEGEL:  By the end of 2019, in terms of people

12   in New York, I think there were like three or four of them

13   left.

14             THE COURT:  Okay.

15             MR. SIEGEL:  And that's the point I'm getting at.

16   By the time he is drawing away, most of the clique is either

17   green lit to be murdered or in jail.  So he is one of the last

18   few people left on the streets.  And at that point, he is

19   pulling away from MS-13, but part of their beef is that -- or

20   part of their concern with him is that he's pulling away from

21   them, he's hanging out with other gangs.  It's not that he's

22   just --

23             THE COURT:  Other gangs, as in other cliques, or

24   other gangs --

25             MR. SIEGEL:  The Surenos gang.

Proceedings                                    26

1    THE COURT:  A completely different gang?

2    MR. SIEGEL:  A completely different gang.

3    And, so, the concern is hanging out with other gangs

4  and that's part of what is rising tension.  Eventually, he,

5  himself is green lit.  And that happens sometime -- I don't

6  have the exact date that it happens.  I don't know the exact

7  date it happens.  But judging on the calls, it is sometime in

8  2020.  He leaves New York and then is arrested.

9    Since his arrest, we've always been aware that he

10  was green lit.  We have kept him separate from the gang for

11  that reason.

12    And I don't want to make the argument that he was

13  never pulling away from the gang, that he was as active in the

14  gang as other people were.  But the suggestion that he made

15  this break and that he left the gang behind, I just don't

16  think it's exactly as it was presented in the defense

17  arguments.

18    THE COURT:  Okay.

19    MR. SIEGEL:  So I think if you consider the

20  unbelievable seriousness of this, the seriousness of the gang

21  that he remained a part of basically until the clique was

22  falling apart, but then balance that against the fact that he

23  did pull away from them toward the end and some people did

24  not.

25    THE COURT:  But I'm trying to understand.  You said

Proceedings                                    27

1    he pulled away from them but towards another gang.

2         MR. SIEGEL:  Yes.

3         THE COURT:  So I'm trying to understand, and Mr.

4    Diaz, you will have to answer that question for me.  To the

5    extent that that is the case, I'm not certain how much I value

6    the notion of pulling away from the gang if it's just to be a

7    member of another gang.

8         MR. DIAZ:  Judge, we've never heard this before.

9    I've never heard this fact ever.  This is not in the

10   discovery.  In all of our discussions and in all of the

11   letters that have gone back and forth, we have never heard

12   that during the period of time that Emerson was pulling away

13   from the gang that he was involved in another gang.  We don't

14   have any information about that.  There's nothing, certainly,

15   in the discovery.  This is the first I'm ever hearing this,

16   Judge.

17        THE COURT:  What's the basis for the Government's

18   assertion that he was moving towards this other gang?

19        MR. SIEGEL:  The basis is based on -- the basis for

20   our understanding is that he had been green lit by the gang.

21        THE COURT:  No, not green lit.

22        MR. SIEGEL:  Well, but all of the discussions about

23   that is that he was green lit because he was associated with

24   the Surenos gang.

25        THE COURT:  I see.  So, forgive me.  Let me let you

Proceedings                                        28

1   just answer the question.

2              What is the basis for your understanding?  Are you

3   talking about telephone communications?  What is it that you

4   are basing this on?

5              MR. SIEGEL:  It is the witness statements about the

6   fact that he was someone who had been part of the Indios and

7   then was pulling away from them and hanging out with the

8   Surenos.

9              THE COURT:  Were those statements provided to the

10  defense?

11             MR. SIEGEL:  Witness statements are not provided.

12             THE COURT:  I'm sorry.  You're right.  Forgive me.

13             MR. DIAZ:  There are a lot of questions there,

14  right, Judge?  What is the basis of this statement?  Is it

15  hearsay?  Did this witness hear it from someone else?

16             This is too attenuated, Judge, I think.  And the

17  fact that we haven't had notice of this, I'm going to ask the

18  Court to disregard that fact.

19             MR. SIEGEL:  Your Honor -- and, look, I'm presenting

20  it as something that I do think that is in some way mitigating

21  because other gangs aren't as bad as MS-13.

22             THE COURT:  I'm only laughing because I don't know

23  if I consider it mitigating.  That is an interesting notion,

24  but I don't view it as mitigating.

25             MR. SIEGEL:  I think the point that I'm trying to

Proceedings                                                    29

1   make is when you compare him to other defendants in this

2   indictment, in this case who have stayed with MS-13 to the

3   date of sentencing, I think that there is something less there

4   for him that I am saying I think the Court can consider.  I'm

5   comparing this, for example, to the sentencing of Salmeron

6   that we had recently where I think one of the things that the

7   Court thought about is the fact that he was still so active

8   within the gang.  And I just want to be clear that our

9   arguments --

10              THE COURT:  You don't want me to consider it.  The

11  Government is not offering it up in a -- or the way in which

12  the Court received the fact was unhelpful to the defendant is

13  not the way in which the Government would like for the Court

14  to apply that fact.  You are suggesting that there is -- you

15  agree with the defense, that he was moving away from MS-13.

16  What he was doing on the other side of that is perhaps less

17  important --

18              MR. SIEGEL:  That's correct.

19              THE COURT:  -- at least in the Government's

20  estimation, because you were trying to make the point that he

21  was moving away from the violent activities of MS-13.  Fair

22  enough?

23              MR. SIEGEL:  Yes.

24              THE COURT:  Okay.  I'm not going to consider the

25  fact of moving to another gang.  I don't think that's the way

Proceedings                                                        30

1   in which the Government wanted me to consider it in any event,

2   and it will resolve at least the factual issue that I don't

3   think we need to get into right now.

4          MR. DIAZ:  I appreciate that, Judge.  Again, that

5   has a lot of weight, Judge, to come out with that statement

6   without having anything provided to us.  But, again, I accept

7   the Court's ruling.

8          THE COURT:  I mean, it is a tough thing, because the

9   actual statements themselves, the Government is right, are not

10  typically provided.  But to understand that this was going to

11  be the assertion in advance of this proceeding, I understand

12  why you would want to have that information.

13         It's not going to bear on the Court's determination.

14         MR. SIEGEL:  The larger point I want to make is, I

15  think the Court should just balance that yes, he pulled away,

16  but, first of all, it was a year after this murder.  So I

17  think it is somewhat presented as he was intimidated into this

18  murder and then this murder happened and then he thought I got

19  to get out of here.  That's not what happened.

20         THE COURT:  It was indeed subsequent to the February

21  2019 murder that his involvement in the conspiracies or the

22  efforts with respect to John Does 1 and 2 transpired.

23         MR. SIEGEL:  I think one of them began before

24  February 2019 and then continued past February 2019.  The

25  other began after February 2019 and its whole course was after

Proceedings                                    31

1    February 2019.

2            So, his impetus for leaving the gang was not this

3    murder.  So, I think balancing -- I think that's why we are

4    asking for the 20-year sentence.  I think that does strike the

5    appropriate balance.  If this were someone who did not have

6    the, at least, arguably mitigating factors, if you look at the

7    other people who are charged in this case and who have now

8    pleaded guilty, they are facing minimum of 30 years.  So, we

9    are looking at this as someone who is less than people who

10   were on the platform, people who then continued with the gang

11   to the very end.

12           THE COURT:  Defense, in their submission, spent

13   least a sufficient amount of time, I think, arguing that his

14   involvement in the gang pretty much all along, leading up to

15   February 2019, was effectively coerced through threats of

16   violence to Mr. Martinez-Lara himself.

17           Can you just respond to that argument, please?

18           MR. SIEGEL:  I just don't have a basis to believe

19   that that's true.

20           People do leave MS-13.  People move away, as he

21   ultimately did.  The reality is if you stop hanging out with

22   them and you stop going to where they are, it's hard for them

23   -- especially if you are in at the low level.  It doesn't make

24   sense to me.  I haven't seen evidence of it.  I haven't seen

25   an example like that, where someone wants nothing to do with

Proceedings                                32

1  the gang and that is suddenly committing murders and then

2  staying with the gang.

3          THE COURT:  Thank you.

4          I will want to have the video played, unfortunately,

5  and two -- that's the victim statement?

6          MR. SIEGEL:  The victim statement.

7          THE COURT:  Let me hear from Mr. Diaz first and then

8  I will hear the victim statement.

9          MR. DIAZ:  Thank you.

10          Your Honor, first and foremost, Emerson is extremely

11  apologetic for his role in this offense.  He is remorseful to

12  the Mosso family.  He is deeply ashamed of himself for

13  participating in this.

14          As we stated earlier, Judge, Emerson was a young man

15  in his late teens when he immigrated into this country.  He

16  struggled in school here but began working immediately and was

17  working and sending money back to his family, particularly his

18  mother who has diabetes.

19          Regrettably, Judge, Emerson began associating with

20  members of MS-13.  However, Judge, during his time of

21  associating with these individuals, Emerson never held any

22  decisionmaking authority.  He did not personally engage in

23  acts of violence towards others.  And as the Government has

24  stated, Your Honor, he himself sustained -- well, I take that

25  back.  He also sustained beatings from members of the gang.

Proceedings                                    33

1         Now, this is something, Judge, that our defense team

2    spoke to a lot of people in the course of this case.

3    Investigators interviewed people, like his girlfriend, but

4    when it came time, Judge, to write letters, a lot of these

5    people were not willing to do so.  And the reason for that,

6    Judge, is a lot of -- they were afraid for immigration

7    purposes, Judge.

8         And even today, Wilmer informed me that other family

9    members wanted to come here today, but they're fearful to come

10   to court.

11        And also, when it was time to get letters, people

12   were very willing to speak to us, but they could not put

13   anything in paper because they also don't know how that can be

14   used subsequently in their home country.  So, we do have a bit

15   of a void there, Judge, and I want to lead with that.

16        I do want to represent, Judge, that our investigator

17   spoke to Emerson's girlfriend.  She corroborated that he had

18   sustained beatings from MS-13.  And I don't think this is

19   anything controversial, Judge, as someone beaten by their own

20   gang.  But I'm saying that in the context of that he, himself

21   was green lit, Judge.  And the reason that he was green lit,

22   Your Honor, was because his minimal participation and his

23   level of enthusiasm for the gang never increased.

24        And I will address the timeline that the Government

25   did in a second here, Your Honor.

Proceedings                                    34

1           THE COURT:  I just want to be clear.  He was green

2    lit over a year, or at least a year after these events that

3    transpired.  So, it's an unfortunate reality or circumstance

4    that, in fact, you know, he was involved with an organization

5    that would call for his own demise.  But I am not certain how

6    that factors in events that transpired a year after the events

7    that bring us here today, or at least some of the events that

8    bring us here today, how that should really have bearing on

9    the way in which I view his conduct at that time, because at

10   that time they hadn't been green lit.  At that time he was

11   simply operating as an associate of MS-13.

12           MR. DIAZ:  Indeed, Judge.  And I am going to address

13   that.  I apologize if I'm not --

14           THE COURT:  You don't have to apologize.  I just

15   need you to understand my thinking.

16           MR. DIAZ:  No, I understand, Judge.  And I agreed

17   with the Government's timeline, when they said that the time

18   that he was pulling out kind of coincided when other members

19   were starting to go to prison.  And I think that that's

20   exactly what happened, Judge, that once the people -- we're

21   not talking about a large group of people here, Judge.  We are

22   talking about a small group.  And the two or three people on

23   top have an outside influence over the other members.  And as

24   long as those members are present, that's where the fear comes

25   in, that's where the coercion comes in, that's where the

Proceedings                                    35

1    intimidation comes in, because this person can hurt me.

2           And just taking what we are talking about here,

3    conspiracy to murder someone, this person -- you know, John

4    Doe is being green lit because he doesn't want to be in MS-13

5    anymore.  So, now, all of the members get instructed that this

6    person is to be dealt with.  So now you have a young person

7    who is 16 -- 18, 19 years old at the time, who's being

8    instructed of this, who's being told by the older members who

9    have this power, who have this influence and charismatic

10   personalities that you need to look for this person.  And why

11   are we looking for this person?  Because he doesn't want to be

12   in the gang anymore.  So, to him, that's telling him if I do

13   the same thing, then these guys are going to come look for me.

14   It is self-preservation, Judge.

15          THE COURT:  I absolutely understand that it is

16   self-preservation.  However, it creates -- I don't deny that

17   there is a self-preservation aspect to this, right.  But in

18   terms of the way in which the Court has to view the conduct,

19   am I sanction the notion that he can preserve his own life to

20   the demise of potentially three others, because there was one

21   gentleman who lost his life on a New York City subway

22   platform, which, by the way, I need you to understand I have

23   inserted that fact every single time I talk about this murder

24   because it matters.

25          MR. DIAZ:  It does.

Proceedings                               36

1          THE COURT:  And then two other individuals, whom he

2     had agreed to be involved in the murder of.  And, so, I am

3     struggling, and I struggled as I read your -- which I consider

4     to be a very well-written submission -- but I struggled when I

5     read it to try and discern what that fact should mean to the

6     Court, because, yes, it perhaps is self-preservation.  This is

7     an organization by its very nature, right, is violent not just

8     to others but to its own members.  It will cannibalize itself,

9     I guess, if necessary.

10         MR. DIAZ:  Indeed, Judge.

11         THE COURT:  But, nonetheless, the result is brutal

12    public murders of individuals.  Am I to say well, that is

13    acceptable conduct because it is a matter self-preservation?

14         I think that might ultimately, right, taken to its

15    logical conclusion -- and the problems that are reflected by

16    this case, by the way, are far too more than this Court can

17    address in a sentencing.  This is complicated stuff.  But at

18    the end of the day, I have to say to myself does that

19    self-preservation -- how many other names get to be on the

20    list and you get to say, oh, it's self-preservation and hence

21    this person was murdered, and I participated in the planning

22    of this person's or involvement somehow in this other person's

23    murder.

24         When is self-preservation simply not sufficient for

25    the Court's consideration particularly when the conduct is not

Proceedings                                        37

1   just heinous but is brazen as what is reflected on that video?

2         MR. DIAZ:  Indeed, Judge.  And I'm not asking the

3   Court to discount it or to give it any weight that it's not

4   entitled to.

5         All I want is to try to give the Court a deeper

6   understanding of what happened here.  And when assessing his

7   level of culpability and what an appropriate sentence should

8   be, Judge, I want the Court to consider the following, and

9   addressing the discovery itself, from the phone calls that we

10  cited, I think it was clear that by the end of 2019 Emerson

11  had started to pull away from the gang.  He had moved away to

12  Maryland.

13        And here comes the Court's question:  Well, why did

14  you continue?  Why didn't you make that break?

15        And the way I understand it, Judge, is that even

16  when he moved to Maryland, there was a heavy MS-13 presence

17  there also, and I think that there's a lot of gang activity

18  there.  And everywhere he went, he was in fear that he could

19  be touched, and they were trying to keep in contact with him.

20        THE COURT:  Wait.  Wait.  I'm no expert in MS-13.

21  They were certainly a different MS-13 clique.

22        Do you have any information that you can provide the

23  Court to suggest there was some coordinated effort from this

24  five-person clique here or we're just talking about the fact

25  that, unfortunately, MS-13 has infiltrated every community in

Proceedings                                              38

1    the United States because that is just the unfortunate

2    reality, but it doesn't have any bearing on his specific

3    circumstances?

4              MR. DIAZ:  Exactly, Judge.  I'm asking the Court to

5    look at it subjectively from the way that he was looking at it

6    at the time.  And I recognize, you know, that there's issues

7    with that, Judge.

8              THE COURT:  Right, because I don't have any facts.

9    I don't have any interactions in Maryland, a threat in

10   Maryland.  He's just in Maryland and MS-13 is there.

11             MR. DIAZ:  But what I do want to say, Judge, is that

12   let's look at his actions.  I don't think that anyone here can

13   say that Emerson was, you know, a proponent of the MS-13

14   banner.  If you look at the discovery, if you look at the

15   calls, this was somebody who was trying to keep these people

16   at bay, but at the same time try not to go that step where he

17   himself --

18             THE COURT:  I get that.  I'm telling you that's a

19   year after he participated as a lookout in the brutal murder

20   of an individual on a subway platform in our city.

21             MR. DIAZ:  Indeed, Judge.  Indeed, Judge.  And,

22   again, all I'm asking the Court is to consider the fact that

23   we laid out, his circumstances, the calls that he was

24   receiving, the threats that he got.  He was green lit and I

25   think a lot is part of this, Judge.  And, again, he allocuted

Proceedings                                                                          39

1    to this, Judge.  He accepted responsibility for this.  I don't

2    want, you know -- I don't want to get diverge here and say

3    that I'm trying to make an excuse for what happened.  He

4    accepted responsibility, Judge.  He did.  And all I'm asking

5    the Court is to just consider these other things that were

6    going on in his life.

7              THE COURT:  I get that.  But you are asking me to

8    consider those, yes.  But you are also advocating for a

9    10-year sentence which, even from the bottom end of the

10   guidelines range, is an incredibly significant departure.  So

11   it is more than, Judge, consider these.

12             MR. DIAZ:  I understand, Judge.

13             THE COURT:  10 years.  The finality of death.

14   Unfortunately, the older we all get, the older we all get, the

15   more clear we are about how final death is.  And it is awful

16   when it is a loved-one of advanced age.  But it's different.

17   My 95-year-old grandmother passed away, God bless her.  She

18   lived a full life.  That's not what we are talking about.  We

19   are talking about unnatural deaths of young people that will

20   never ever come back.  Death is so final.  And the consequence

21   of death visited obviously on the person who is deprived of

22   their life is bad, but the consequence of death on those who

23   are left behind, that is a prison sentence that is life.  That

24   is life.

25             So I just think that we need to make sure, right,

Proceedings                                                40

 1   while I am taking into consideration -- and I will -- all of
 2   the factors that contributed to Mr. Martinez-Lara's kind of
 3   participation in this event.  It has to be.  It must be in a
 4   case like this against the backdrop of the seriousness of this
 5   crime.  The bell that can never be unrung and harm that could
 6   never, ever be remedied.
 7           MR. DIAZ:  Indeed, Your Honor.  And I just want to
 8   read a small quote from his post-arrest statement, where, in
 9   answering the police officer, Emerson states:  Deep down, I
10   did not feel right about what they were doing.  But you're
11   obligated with these people.  You're always in fear that
12   someone is going to kill you.
13           So that same finality that the Court described, Your
14   Honor, was also a powerful motivator for him.  And what he
15   did, he's not proud of it.  He's ashamed.  He pled guilty to
16   it.
17           But at the same time, I wouldn't be giving the Court
18   a full picture of what this young man was going through at the
19   time if I didn't let the Court know about that and tell you
20   what he said in these phone calls and what he said in the
21   statement.
22           And Emerson went on to tell the officer, and this is
23   a quote from his statement, when you refuse, they threaten to
24   kill you.  And after I did that, I stopped coming around, I
25   only went to work and stayed in the house because I knew I had

Proceedings                                             41

1   been green lit.

2           THE COURT:  But that was a year after this murder.

3           Obviously, the Court would look at it differently if

4   you said that refusal -- because at least implicit in his

5   statement was that there was a refusal.  I don't think there

6   is evidence of an actual refusal.  But if you had said he

7   refused and they threatened him and, therefore, he was there.

8   But that's not what we have.

9           MR. DIAZ:  His brain wasn't fully developed yet,

10  Judge.  That's what happened.  And that's where the age comes

11  in.  And that's where all these things come in, Judge.

12          THE COURT:  I'm just saying, so we have a guideline

13  range, and I have been operating from the bottom of the

14  guidelines range in terms of my discussion thus far.  I said,

15  you know, you're asking for a departure that is significant

16  from the bottom of the guidelines range.  But I guess my

17  question is arriving at a sentence that is sufficient, but not

18  the greater than necessary, given the facts of this case.  And

19  we are going to play that video next.  Potentially the Court

20  can arrive at a sentence that is sufficient, but not the

21  greater than necessary.  When you take into account all of the

22  factors, it still puts him in the guidelines range given the

23  nature of this crime and how it occurred, because I see facts

24  here, right, that say bottom of the guidelines range wouldn't

25  be the right sentence.  Not only did this occur, but it

Proceedings                                              42

1   occurred on our subway platform.

2          You mentioned your children.  Everybody's children

3   are on those platforms who want to get home safely to their

4   families every day.  We're done.  We're tired.  And we're

5   scared.  We're scared as a community.  We're scared.

6          I want to play the video.

7          MR. SIEGEL:  While we are setting it up, I just want

8   to provide the context of the video.  As we lay out in our

9   memo, three members of the Indios clique, which are Ramiro

10  Gutierrez, Tito Martinez-Alvarenga, and Victor Lopez.  They

11  followed Abel Mosso onto the subway at Flushing.  Two of them

12  got into the same car with him.  And as the train was arriving

13  at the 90th Street station, he was assaulted by Mr.

14  Martinez-Alvarenga and Mr. Lopez, who had a gun.  That

15  fight -- the train got to the platform and was stopped.  The

16  conductor stopped the train because of the disturbance.  There

17  was a struggle over the gun.  It spilled out on to the

18  platform.  They were joined by Mr. Gutierrez and that's where

19  the video begins.  As you'll see, they're struggling over the

20  gun.  People are trying to help.  Mr. Martinez-Alvarenga is

21  keeping people at bay.  One of them does yell out we are going

22  to kill him.  We are MS-13.  Nobody get involved.

23         And then once Mr. Gutierrez gets back control over

24  the gun, he shoots Mr. Mosso I think it is either five or

25  seven times in the head.

Proceedings                                              43

1          THE COURT:  It is on my screen.

2          (Video playing.) (Video stopped.)

3          THE COURT:  All right.  You can take that down.

4          Yes.  You can proceed.

5          MR. SIEGEL:  At this point, I would like to read a

6     letter provided by Abel Mosso's mother.

7          Honorable, Judge, I write to you from a heart full

8     of pain as Abel Mosso's mother.  My dear son died on February

9     3rd, 2019.

10         His death left a permanent and painful mark on our

11    family, and I feel that it is important that I share the

12    emotional impact that his death has had on my children and me

13    as his mother.  Able's death was a devastating blow for our

14    family, especially for his brother Misael and his younger

15    sister Jacqueline.  Misael, who was very close to Able, has

16    had great difficulty in accepting his lose.  He would cry at

17    night unable to accept that his younger brother was no longer

18    with us.  This pain led him to a deep depression.  And in an

19    attempt to cope with it, he started drinking excessively.  His

20    inability to sleep and constant pain led him to making wrong

21    decisions, and he is now suffering the consequences of those

22    actions.

23         My daughter Jacqueline was also deeply affected.

24    She would cry every night and the nightmares she had about her

25    brother caused her to suffer great emotional distress.

Proceedings                                    44

1    Jacqueline received therapy in school to try to cope with it,

2    but the pain lingers.

3           I share these painful details because my son Able

4    was murdered in a violent and sudden way.  I have still not

5    overcome the pain.  Unfortunately, when my son's life was

6    taken, I was now allowed to see him.  This fact has been a

7    very heavy emotional burden for me, and it is still one of the

8    greatest tragedies that I have faced.  I recognize that Misael

9    made a bad decision coming from a place of great emotional

10   anguish that has not received proper care.

11          I thank you for taking the time to consider this.

12   We hope the Court may consider the profound emotional impact

13   that our family has experienced and continues to face in our

14   healing process.  That is why I ask for justice for my son's

15   death because he did not deserve to die that way.

16          It is signed by his mother.

17          THE COURT:  Can I have it?  Thank you.

18          Folks, the other three individuals involved in this

19   particular crime, and unfortunately, there are just so many

20   individuals in these cases, remind me of the status of those

21   three individuals' cases.

22          MR. SIEGEL:  So, there was three who I mentioned and

23   there's a fourth who was an additional lookout.  Those were

24   going to be the fourth defendants at the April trial.  They

25   have now all pleaded guilty.  Mr. Lopez pleaded guilty to a

Proceedings                                                45

1   Rule (c)(1)(C) plea with a floor of 30 years and a maximum of

2   life.

3           Mr. Gutierrez and Mr. Martinez-Alvarenga pled guilty

4   to (c)(1)(C) pleas with a floor of 40 years and a ceiling of

5   life.  Both of them also pleaded guilty to a second murder.

6           THE COURT:  Okay.  So the two gentlemen that have

7   the 40 to life plea agreement, there are two murders that they

8   are responsible for?

9           MR. SIEGEL:  That's correct.

10          THE COURT:  So that's three.  And then there is the

11  additional lookout.

12          MR. SIEGEL:  Mr. Santos-Novoa, who was another

13  lookout, he pleaded guilty to charges carrying a range between

14  zero and 25 years.

15          THE COURT:  And obviously, look, we know that when

16  it comes to looking at disparities, the Court is to look

17  nationally.  But it is my practice to also look at the

18  participants in this case.  And here, at a minimum, each of

19  the other participants who, no question, had greater

20  involvement than the defendant present before me, if we take

21  it from the 30 to life, because there is only one that was the

22  one murder here, is at least exposed to, at a minimum, 10

23  years greater than Mr. Martinez-Lara on the bottom of the

24  guidelines range.  Did I get that right?

25          MR. SIEGEL:  The bottom is 235.  So that's five

Proceedings                                        46

1   months more than 10 years.

2              THE COURT:  Roughly.  All right.  Mr. Diaz.

3              MR. DIAZ:  Yes, Judge.  I just want to make two

4   final points, Judge, and the first one the Court has already

5   alluded to, that this is horrible, Judge.  What happened is

6   horrible.  There's nothing I can say at all here, Judge, with

7   respect to that, except that, you know, we are asking the

8   Court to consider his level of culpability.  He did not

9   physically assault Mr.  Mosso.  He was not on the platform.

10  He did not participate in how they got the gun.

11             THE COURT:  But the guidelines range, doesn't it

12  account for all of those things?

13             MR. DIAZ:  The guidelines range is high, Judge.  The

14  guidelines range --

15             THE COURT:  But somebody died.

16             MR. DIAZ:  I know, Judge.

17             THE COURT:  It's high because someone is dead.

18             MR. DIAZ:  Yes.

19             THE COURT:  It is high because that individual is

20  never coming back again.

21             It is high because that mother had to bury her son.

22             Look, when I have a problem with the guidelines

23  range, I don't have a problem saying it.  I don't have a

24  problem saying it.

25             It's high for a reason in this particular case.

Proceedings                                          47

1    Sometimes it's high and the policy reasons, you can't square

2    it.  And I do everything in my ability, when I have discretion

3    to do so, to adjust it consistent with the way in which I

4    believe it is appropriate and consistent with the rule of law.

5    Yes, it's high.  It should be high.

6              Okay.  Go ahead.

7              MR. DIAZ:  No, no, Judge, and again, I don't want to

8    belabor this, Judge.  All I'm trying to do is just make a

9    distinction between, you know, the individuals involved here

10   and --

11             THE COURT:  But to my point, the fact that his

12   involvement was less than, isn't that not reflected in the

13   fact that his guidelines range, right, here is at least, in

14   some respects, lower.  I mean, he's not facing a life sentence

15   or a potential life sentence.  He's not facing a floor of 30

16   years as a floor.

17             MR. DIAZ:  Right.  He could still face life.

18             THE COURT:  He could.

19             MR. DIAZ:  But you're right, Judge.  Everything you

20   said is true, Your Honor.

21             And the other thing I want the Court to consider

22   is --

23             THE COURT:  I'm not sentencing him to life.  He is

24   not facing life.  So, go ahead.

25             MR. DIAZ:  Thank you, Judge.

Proceedings                                        48

1          But the other thing I also wanted to bring to the

2     Court's attention, Judge, is the collateral consequences of

3     this, that even after he faces whatever time the Court feels

4     is appropriate here, that he still faces indefinite

5     imprisonment upon his return to El Salvador.

6          THE COURT:  The mass prison?  The El Salvadorian

7     prison?  The mega prison that was built --

8          MR. DIAZ:  That's where they're putting them, Judge.

9     But I think the part that is more disturbing and relevant for

10    our analysis is that they've suspended, you know, certain due

11    process rights.  And a person can be held indefinitely at that

12    prison on the mere allegation that you are a member of a gang,

13    of any gang there.  Here, you're going to have Emerson being

14    returned there with a conviction for admitting to being an

15    MS-13 member.

16         THE COURT:  The concern here that you are

17    articulating now is the collateral consequence that once

18    released from a U.S. prison he will be sent to El Salvador,

19    and as part of the criminal system there, that he would, just

20    on mere suspicion of participation, and I suspect they would

21    have more than mere suspicion of gang involvement, that he

22    would then be placed in the El Salvadorian prison, which I am

23    assuming you are asserting, and I've obviously read up on it

24    myself, is a place where no one wants to be.

25         MR. DIAZ:  Especially when you are green-lighted.

Proceedings                                                    49

1       THE COURT:  How does having him serve less time in a

2   U.S. prison help him there?

3       It doesn't help.  I'm just saying in terms of my

4   calculation, in terms of your argument saying, Judge, this is

5   a reason to sentence him to less time -- I mean, I don't know.

6   He is safer, potentially, in a U.S. prison segregated than

7   released in an El Salvador prison, based on your argument.

8       MR. DIAZ:  Indeed, Judge.  And I think that argument

9   goes more towards future dangerousness and protecting the

10  community, that if there was any concern by the Court, that,

11  you know, giving him a lesser sentence, that he's going to go

12  out there, I'm just letting the Court know that he does face

13  additional incarceration and additional penalties as a result

14  of this even after he serves his sentence.

15      THE COURT:  Okay.  Anything else from the

16  Government?

17      MR. SIEGEL:  No.  Thank you, Your Honor.

18      THE COURT:  Does Mr. Martinez-Lara want to address

19  the Court?

20      MR. DIAZ:  Yes, Judge, if the Court will permit it.

21      THE COURT:  I will.

22      He can stand at the podium.

23      You can take your time.

24      THE defendant:  When I think about Mr. Abel Mosso's

25  family, I feel sad and remorseful.  I want to ask his family

Proceedings                                    50

1    for forgiveness.  I will never let anything like this happen

2    again.  I will never get involved in anything like this again.

3    I wish someday I can find a job so I can help my family, to

4    continue helping my mother, so she can get her medication.

5    I'm very sorry.

6              Thank you.

7              THE COURT:  Thank you, Mr. Martinez-Lara.

8              Does Probation want to offer anything as part of

9    this discussion?

10             THE PROBATION OFFICER:  No, Your Honor.

11             THE COURT:  All right.  Just give me a second.  I

12   want to make sure that I have asked everything I need to ask

13   of the parties.  Do I have information -- I think I do.

14   Beyond the issue with discovery, can you remind me of the

15   information that I have with respect to Mr. Martinez-Lara's

16   conduct in prison, please?

17             And I'm well aware of -- I think -- the discovery

18   issue, but go ahead.

19             MR. SIEGEL:  There is the additional issue of him

20   blocking view for his cellmate when he was taking a piece of

21   the fence to make a shank.

22             THE COURT:  When did that occur?

23             MR. SIEGEL:  Just one moment.

24             THE COURT:  That's in your supplement, right?

25             MR. SIEGEL:  That's in the supplement, yes.

Proceedings                                              51

1          That was on February 29, 2024.

2          THE COURT:  And with respect to the discovery, the

3  Government is not asserting that he used information that was

4  provided in the discovery toward some improper end but rather

5  he used the devices that were available to him so that he

6  could -- I mean, that's really what we're coming down to?

7          MR. SIEGEL:  Here's what we have.  I will just

8  recite the facts.  As Your Honor knows, there was a motion for

9  him to get extended access to his discovery drive.

10         THE COURT:  Which I granted.

11         MR. SIEGEL:  There was quite a bit of litigation

12  about that, and then there was the jail, in response, noted

13  that when they were giving him access to the law library, that

14  he was refusing to go, that he only wanted to review the

15  discovery in his cell.  What eventually happened with the

16  discovery drive is that he was caught handing off a computer

17  and the drive to another inmate.  That other inmate took it

18  into their cell, covered the window, and then when the guards

19  went in --

20         THE COURT:  Right.  But I'm trying to understand

21  when you say the discovery drive, were other individuals

22  reviewing the discovery in this case or using the device or

23  whatever you gave them to look at porn?

24         MR. SIEGEL:  So, there was porn on the drive.

25  Whether that is porn that he was able to put on the drive

Proceedings                                    52

1   through some conduct in the jail or whether, as the defense

2   has asserted, that on one of the Cellebrite extractions that

3   was provided there was already porn because someone had porn

4   on their phone.

5           THE COURT:  Other than trying to look at porn -- I'm

6   just trying to find out if this conduct was about this

7   25-year-old man trying to look at porn in prison.

8           MR. SIEGEL:  That's what it's about.

9           THE COURT:  Okay.  That's all I needed.

10          I am going to take a break.

11          MR. SIEGEL:  Thank you.

12          MR. DIAZ:  Thank you.

13          THE COURTROOM DEPUTY:  All rise.

14          (Recess taken.)

15          THE COURTROOM DEPUTY:  All rise.

16          THE COURT:  Folks, I have an unfortunate update

17  given where we are in the juncture of this sentencing.  I

18  don't have an interpreter available.  I can't proceed without

19  one.

20          She's back.  All is okay with you.  Then we can

21  proceed.

22          You all can be seated.

23          All right.  Folks, before I proceed, I do want to

24  note that I had an opportunity to read the statement by Mr.

25  Mosso's mom during the recess.  And I just need to state how

Proceedings                                              53

1    incredibly impressed I am by this woman.  In the face of the

2    tremendous loss of her son, she could, as many might be, be

3    bloodthirsty and ask this Court to levy the greatest penalty

4    available under the law, but I note that she closes her letter

5    by asking simply for justice for her son.  I hope that the

6    sentence that I render today will seem, in her estimation,

7    just.

8            I thank Mr. Martinez-Lara for his statement to this

9    Court prior to the recess.  I will say that I do believe his

10   words of remorse are genuine.  I have had a number of

11   individual before me, in particular, this week, and I can't

12   say the same is true of all those who have appeared before me,

13   even in crimes as serious as this.

14           That said, the Court needs to make a determination

15   here based on all of the facts available to me in this case.

16           In assessing the 3553(a) factors, I note the first

17   factor the Court is to look to is the seriousness of the

18   crime.  That is no more important than in cases of this sort

19   where the crime itself resulted in the loss of someone else's

20   life, and indeed, in this case, where the loss of someone's

21   life was the intent and the purpose of the crime itself.

22           It is not altogether clear to me from the facts that

23   I have in front of me how it is that this defendant came to

24   join the MS-13 gang.  I don't see the evidence in the record

25   that suggests at the time that he joined this gang that it was

Proceedings                                                    54

1    the result of specific threats of coercion.  It is the nature

2    of this gang, of course, to engage in violence and they rule

3    their own members through violence.  That is true.  But I

4    don't see evidence here that this particular defendant at the

5    time that he joined this gang and then continued in the gang

6    that he did so under any specific threat.

7              That is not to say that Mr. Diaz's arguments

8    concerning Mr. Martinez-Lara's age is lost on me.  It is a

9    factor for this Court to consider.  It cannot be ignored.  He

10   was just 19 years old at the time that the crime was

11   committed.  He had the mind of a 19-year-old at the time that

12   the crime was committed.

13             The Government itself concedes that that's a factor

14   that must be considered.  And I will.

15             I do agree, however, with the Government that the

16   way in which I can consider his age must be nuanced.  It must

17   take into consideration not just the simple number in terms of

18   his age.  He was 19 years old, but it also has to be

19   considered against the crime itself.  It was a deliberate,

20   thoughtful, premeditated action, which is less the sort of an

21   impulsive crime that yes, I think the Government is correct,

22   that we associate with youthful, for lack of a better phrase,

23   indiscretion.  And, so, while I will consider it, it is

24   complicated, as this case is generally.

25             The guidelines range here is 235 to 293 months.  And

Proceedings                                    55

1    as a general matter, for an individual who has a zero criminal

2    history, the Court starts at the bottom end of the guidelines

3    range.  It makes sense to me.  However, I noted that in this

4    particular case it is an incredibly, incredibly significant

5    factor that this crime took place on a New York City subway

6    platform.  It was intended to take place on a New York City

7    subway platform.  And on that platform seven shots were fired.

8    Countless, countless individuals, innocent people were on that

9    subway platform.  It seems to me it's with the grace of God

10   that no one else, other than the poor soul who died here

11   today, was injured.  The conduct of this gang, these

12   individuals on that day jeopardized the safety of all of us.

13   And that is not lost on me.

14          So while my starting point would be 235 months as a

15   general matter, I believe the fact that this took place on a

16   New York City subway platform, that it was intended to take

17   place on a New York City subway platform, is a reason why this

18   Court believes, as a general matter, 235 months would be

19   insufficient.  That is counterbalanced, of course, by the

20   considerations that I spoke to concerning Mr. Martinez-Lara's

21   age.

22          So I will not sentenced Mr. Martinez-Lara to the

23   highest end of this guidelines range, which certainly could be

24   justified based on these facts.

25          I have no concerns about potential disparity in

Proceedings                                                    56

1    sentencing here.  We have talked about the other individuals

2    involved and the types of sentences that they might be

3    subjected to.  But in this case I believe, taking all of the

4    considerations that the Court must, and I have, I promise you,

5    considered every argument that the parties have made, but I

6    believe that a sentence in this case of 216 months in custody

7    is sufficient, but not the greater than necessary, to comport

8    with the aims of sentencing.

9              MR. DIAZ:  16, Judge?

10             THE COURT:  216.

11             Give me a second, folks.

12             All right.  I must now also consider whether to

13   impose a term of supervised release.  I am required to

14   consider the factors set out in 18 U.S.C. Section 3583(c),

15   including the nature and circumstances of the offense, the

16   history and characteristics of the defendant, the need to

17   afford adequate deterrence to criminal conduct, the need to

18   protect the public from further crime of the defendant, the

19   need to provide the defendant with needed educational or

20   vocational training, medical care, correctional treatment in

21   the most effective manner, the need to avoid unwarranted

22   sentence disparities among defendants with similar records who

23   have been found guilty of similar conduct, the need to provide

24   restitution to any victims of the offense, the kinds of

25   sentences, and the sentencing range established for the

Proceedings                                                    57

1   offense, and any pertinent policy statement.

2           Does the Government wish to make any arguments

3   concerning these factors?

4           MR. SIEGEL:  No.  Thank you, Your Honor.

5           THE COURT:  Mr. Diaz?

6           MR. DIAZ:  No, Your Honor.

7           THE COURT:  Probation Department has recommended a

8   term of three years of supervised release.  I believe that is

9   a prudent recommendation.  I intend to follow that.  The Court

10  imposes a term of three years of supervised release.

11          I need to apprise Mr. Martinez-Lara's obligations

12  with respect to supervised release.

13          Sir, if you violate any of the conditions of your

14  supervised release, I may sentence you up to two years in

15  prison without credit for your pre-release imprisonment or

16  time previously served on post-release supervision.

17          I'm sorry.  I need to take a step back because I

18  failed to mention that, quite candidly, part of Court's

19  calculus in terms of an appropriate of sentence here is the

20  information that I have concerning Mr. Martinez-Lara's conduct

21  subsequent to the events that transpired in February of 2019,

22  specifically with respect to the John Doe 1 and John Doe 2.  I

23  just need to say that it informed or helped to inform the

24  Court's determination as to an appropriate sentence.

25          Moving along.

Proceedings                                    58

1        Mr. Martinez-Lara, during your period of supervised

2   release, you must abide by the following mandatory conditions

3   of supervised release:  You must not commit another federal,

4   state or local crime.

5        You must not unlawfully possess a controlled

6   substance.  You must refrain from any unlawful use of a

7   controlled substance.

8        You must submit to one drug test within 15 days of

9   release from imprisonment and at least two periodic drug tests

10  thereafter as determined by the Court.

11       You must cooperate in the collection of DNA as

12  directed by the probation officer.

13       In addition, you must abide by the following

14  standard conditions of supervised release:  You shall report

15  to the probation office in the federal judicial district where

16  you are authorized to reside within 72 hours of release from

17  imprisonment unless the probation officer instructs you to

18  report to a different probation office or within a different

19  timeframe.  After initially reporting to the probation office,

20  you will receive instructions from the Court or the probation

21  officer about how and when to report to the probation officer

22  and you shall report to the probation officer as instructed.

23       You shall not knowingly leave the federal judicial

24  district where you are authorized to reside without first

25  getting permission from the Court or the probation officer.

Proceedings                                          59

1        You shall answer truthfully the questions asked of
2   you by the probation officer.

3        You shall live at a place approved by the probation
4   officer.  And if your plans change with respect to where you
5   live or anything about your living arrangements, including the
6   people you live with, you shall notify the probation officer
7   at least 10 days before the change.

8        If notifying the probation officer at least 10 days
9   in advance is not possible due to unanticipated circumstances,
10  you shall notify the probation officer within 72 hours of
11  becoming aware of the change or expected change.

12       You shall allow the probation officer to visit you
13  at any time at your home or elsewhere.  And you shall permit
14  the probation officer to take any items prohibited by the
15  conditions of your supervision that the probation officer
16  observes in plain view.

17       You shall work full-time, that is at least 30 hours
18  per week at a lawful type of employment unless the probation
19  officer excuses you from doing so.

20       If you do not have full-time employment, you shall
21  try and find full-time employment unless the probation officer
22  excuses you from doing so.

23       If your plans change with respect to where you work
24  or anything about your work, such as your position or job
25  responsibilities, you shall notify the probation officer at

Proceedings                                              60

1    least 10 days before the change.  If notifying the officer in

2    advance is not possible due to unanticipated circumstances,

3    you shall notify the officer within 72 hours of becoming aware

4    of the change or expected change.

5            You shall not communicate or interact with someone

6    you know who is engaged in criminal activity.  If you know

7    someone who has been convicted of a felony, you shall not

8    knowingly communicate or interact with that person without

9    first getting permission of the probation officer.

10           If you are arrested or questioned by a law

11   enforcement officer, you shall notify the probation officer

12   within 72 hours.

13           You shall not own, possess, or have access to a

14   firearm, ammunition, destructive device, or dangerous weapon,

15   with anything that was designed or was modified for the

16   specific purpose of causing bodily injury or death to another

17   person, like a TASER.

18           You shall not make any agreement with a law

19   enforcement agency to act as a confidential human source or

20   informant without first getting permission of the Court.

21           If the probation officer determines, based on your

22   criminal record, personal history and characteristics, as well

23   as the nature and circumstances of your offense, that you pose

24   a risk to another person, including an organization, the

25   probation officer, with prior approval of the Court, may

Proceedings                                              61

1   require you to notify the person about the risk and you must

2   comply with that instruction.

3          The probation officer may contact the person and

4   confirm that you have notified them of the risk.  And you

5   shall follow the instructions of the probation officer related

6   to the conditions of your supervision.

7          Now, in advance of this proceeding, I believe that

8   you all received and reviewed the Court's proposed special

9   conditions of supervised release.  Yes?

10         MR. DIAZ:  Yes, Your Honor.  My client actually just

11  signed it and it is signed by all of the parties.

12         THE COURT:  Great.  If you could hand that up.

13         Folks, I have in front of me what is marked Court

14  Exhibit 1 and is entitled special conditions of supervised

15  release, which delineates three special conditions the Court

16  seeks to impose.  It's been executed by both the defendant,

17  defense counsel, and the Government.

18         Do you each waive the Court's reading of these

19  special conditions into the record?

20         MR. SIEGEL:  Yes, Your Honor.

21         MR. DIAZ:  Yes, Your Honor.

22         THE COURT:  All right.

23         Mr. Diaz, is the Court's reasons for imposing each

24  of these special conditions apparent on the face of each

25  condition?

Proceedings                                                        62

1          MR. DIAZ:  Yes, Judge.

2          THE COURT:  All right.  I must order that Mr.

3    Martinez-Lara pay a special assessment in the amount of $100.

4    I decline, however, to impose a fine, as it does not appear

5    that Mr. Martinez-Lara is able to pay one.

6          Now, Mr. Martinez-Lara, you have a statutory right

7    to appeal your sentence under certain circumstances,

8    particularly, if you believe your sentence was contrary to

9    law.

10          Any Notice of Appeal must be filed within 14 days of

11    the entry of judgment or within 14 days of the filing of

12    Notice of Appeal by the Government.

13          If requested, the clerk will prepare and file a

14    Notice of Appeal on your behalf.  And if you cannot afford to

15    pay the cost of appeal or for appellate counsel, you have the

16    right to apply for leave to appeal in forma pauperis, which

17    means you can apply to have the Court waive the filing fee.

18          On appeal, you may also apply for court-appointed

19    counsel.

20          Give me a second, folks.

21          Now, I understand that with respect to where Mr.

22    Martinez-Lara might be housed is obviously complicated by his

23    circumstance.  What recommendation, if any, would you like me

24    to make here?

25          MR. DIAZ:  Yes, Judge, and understanding that it's a

Proceedings                                                    63

1    recommendation and the Court only has so much power over BOP.

2    We have identified several facilities, Judge, that we believe

3    are what are called dropout yards, and those are facilities

4    for ex-gang members, cooperators, people who are looking to be

5    separated from gang inmates.  Those facilities are FCI Thomson

6    in Illinois, USP Terre Haute in Indiana, USP Tucson in

7    Arizona, USP Allenwood in Pennsylvania.

8                THE COURT:  I'm sorry.  The Arizona facility?

9                MR. DIAZ:  USP Tucson.

10               And, finally, Your Honor, FCI Coleman in Florida.

11               THE COURT:  All right.  The Court will recommend

12   that Mr. Martinez-Lara will be housed at any of these four

13   facilities:  Thompson, Terre Haute, Tucson -- and where in

14   Florida?

15               MR. DIAZ:  Coleman.

16               THE COURT:  And FCI Coleman.

17               Does the Government have any motions it would like

18   to make at this time?

19               MR. SIEGEL:  Yes, Your Honor.  We move dismiss the

20   open counts of the second superseding indictment, which I

21   believe are Counts One, Two, Five, Sixteen, Seventeen,

22   Eighteen, Twenty, and Twenty-Two.

23               THE COURT:  Okay.  Yes.

24               MR. SIEGEL:  If I have missed any, it's intended to

25   be everything.

Proceedings                    64

1        THE COURT:  You didn't, at least by my count.

2        MR. SIEGEL:  Also, the underlying indictments, the

3   original indictment and the first superseding indictment.

4        THE COURT:  All right.  Counts One, Two, Five,

5   Sixteen, Seventeen, Eighteen, Twenty, and Twenty-Two of the

6   second superseding indictment as they pertain to Mr.

7   Martinez-Lara are dismissed, as well as the underlying

8   indictment as it pertains to Mr. Martinez-Lara.

9        Anything else?

10        MR. DIAZ:  Yes, Judge.  If the Court can direct that

11   any travel documents or personal property belonging to Mr.

12   Martinez-Lara be released by the Government.

13        THE COURT:  Yes.

14        MR. DIAZ:  Thank you, Your Honor.

15        THE COURT:  There should be no objection to that,

16   right?

17        MR. SIEGEL:  We have no objection.  I don't know at

18   this point if we have them or Pretrial has them.

19        THE COURT:  Whoever has it --

20        MR. SIEGEL:  But whoever has it, we will coordinate

21   that.

22        THE COURT:  Anything else?

23        MR. DIAZ:  No, Your Honor.  Thank you.

24        THE COURT:  All right.  Mr. Martinez-Lara, sir, I

25   know this is a difficult day for you.  As I said, I appreciate

Proceedings                                                65

1   that your statements of remorse are genuine.  I do wish you

2   well.  And I do hope that once you have had an opportunity to

3   serve your sentence that there will be further opportunity of

4   growth for you and that you have a future that is untethered

5   to the violence that has unfortunately marred your life so

6   far.  And I do wish you luck, sir.

7           Thank you.

8           MR. DIAZ:  Thank you, Judge.

9           THE DEFENDANT:  Thank you.

10          THE COURTROOM DEPUTY:  All rise.

11          (Matter adjourned.)

12                  *     *     *     *     *

13  I certify that the foregoing is a correct transcript from the
    record of the proceedings in the above-entitled matter.

14

15  /s/ Michele Lucchese              February 12, 2025
    _____       _____
16  Michele Lucchese                  DATE

17

18

19

20

21

22

23

24

25